AGNES E. ABEL, as Executrix, etc., Respondent, *v.* THE PRESIDENT, MANAGERS AND COMPANY OF THE DELAWARE AND HUDSON CANAL COMPANY, Appellant.

A railroad company is bound to guard its employes against negligence of co-employes, so far as it can, by the enactment and promulgation of reasonable rules in the management of its business, and the rule that the employe takes the risk of the business is subject to the qualification that the company perform this, as well as other duties, to protect the employe from unnecessary hazards while engaged in his work.

Upon the trial of an action to recover damages for alleged negligence causing the death of plaintiff's testator, a repairman in defendant's employ, who was killed while at work under a car, the negligence charged was the omission to promulgate proper rules for the protection of car repairers. The rules of other companies upon this subject were given in evidence, and the court charged in substance that the jury were to weigh the evidence and, in view of the rules adopted by different companies, determine whether defendant had discharged its duties, but that they were not to find a rule proper or improper because some other company had adopted or rejected it. *Held,* no error.

(Argued June 2, 1891; decided October 27, 1891.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made May 6, 1890, which affirmed a judgment in favor of plaintiff entered upon a verdict and affirmed an order denying a motion for a new trial.

This was an action to recover damages for the negligent killing of Perry Abel, plaintiff's testator, who, while in the employ of defendant as a car repairer, was caught between two cars standing upon a side track for the purpose of being repaired, upon one of which he was working, which were pushed together by a switch engine.

Further facts are stated in the opinion, which is given in full.

"The judgment of nonsuit rendered on the first trial of this action was reversed by this court on the ground that the question of negligence in respect of the duty of the defendant to make and promulgate proper rules for the protection of car repairers, should have been submitted to the jury. (103 N. Y. 581.) The second trial resulted in a verdict for the plaintiff. This appeal is from the judgment on the verdict.

" The additional evidence given on the last trial on the sub-ject of rules would not have justified the trial court in deter-mining as a question of law that the defendant's duty in this respect had been performed. The company neither by its board of directors nor by any general officer or superintendent, ever enacted or published any rule for the special protection of car repairers, nor was any instruction, verbal or otherwise, ever given by any superior officer to their subordinates on the subject. Rule 63 of the general rules of the company was enacted primarily, as its language shows, to regulate the move-ment of ordinary trains and to prevent collisions, and had no reference to the switching of cars on the repair tracks. It stated what doubtless was generally understood by employes, that a red flag by day or a red lantern by night was a danger signal. But it gave no instructions for the protection of car repairers, either as to the duty of maintaining the signal while the car repairers were at work, or as to the persons by whom it might be removed. At Mechanicville, where the accident occurred, it seems to have been left to Cowen, the foreman of the repairers, and to Donnelly, the foreman of the switchmen, to regulate the matter in their discretion. Cowen testifies that he told his men that they were to work under the protec-tion of a red flag, and that he designated Hickey and Patrick, who worked at the north end of the cars on the cripple track, and Dwyer and Wicks, who worked at the south end, to put a red flag in the draw-head of the outermost car at the respect-ive ends, before going to work, and to protect the same, and also that he informed Donnelly and the brakemen that the repairmen worked under the protection of the red flag.

" Donnelly on the first trial testified substantially that the only rule he heard of was rule 63, and what the repairmen told him, viz. : that they worked under the protection of a red flag. It is evident that if this was the extent of the regula-tions on the subject, the repairmen had a very inadequate pro-tection. If the red flag was put up and maintained, wherever the repairmen were at work, and the meaning of the signal was known by the switchmen, as it probably was, the repair-men would be protected, except as against the reckless or heed-less conduct of the switchmen. But it was essential to the

efficiency of the rule that it should designate the persons authorized to remove the flag. It was shown that this was done by the rules of the New York Central Railroad, which provide that the repairmen alone should have power to remove the flag from cars on a repair track. The same rule was recommended in railroad manuals published before the occurrence of the accident in question. It is obvious that such or a similar regulation, which should place the duty and responsibility of removing the flag upon persons officially designated, was essential to the car repairers' protection. The rule that they should put up a red flag when they commenced work, unaccompanied by a rule prohibiting the brakemen or other employes from taking it down when they desired to remove cars from the cripple track, unless by the consent or direction of the repairmen engaged in repairing the cars, would leave the repairmen exposed to the danger of the mistake or negligence of the brakemen. If it was left for the brakemen to determine for themselves whether there were men engaged in repairing the cars, and whether the flag might be safely removed or not, and to act upon their judgment in removing it, the chances of accident would be greatly increased.

"It appears from the evidence that it was the common practice of both Donnelly and the brakemen to remove the flag when they supposed there was no one under the cars. On another occasion, a repairman came near being caught and injured in consequence of this practice.

"It is settled doctrine that a railroad company is bound to guard its employes against negligence of co-employes so far as it can, by the enactment and promulgation of reasonable rules in the management of its business.

"The rule that the servant takes the risks of the business is subject to the qualification that the master must exercise reasonable care to guard the servant while engaged in his duties, from unnecessary hazards, including hazards from negligence of co-employes. In the business of a railroad this duty is especially important in view of the dangers of the employment, and the serious consequence, likely to ensue from the negligence of co-employes.

"There can, we think, be no doubt that upon the evidence

given on the former trial, it was for the jury to say whether the defendant had discharged its duty toward the decedent. It had made no distinct rule for the protection of the repair-men while engaged in discharging their dangerous duties. It appears to have been left to subordinates in the yard to estab-lish such rules as they thought reasonable. And as the case stood on the first trial there was no pretense that there was any regulation prohibiting the brakemen or any one else from removing the flag. On both trials it appeared that the flag was put up by the proper person (Hickey) before the repair-men commenced work, and that some one took it down and laid it on the ground while Abel (the deceased) was at work under one of the cars. The engine was backed down against the cars on the cripple track and Abel was caught between the cars in attempting to escape. It does not distinctly appear by whom the flag was taken down. The jury would have been justified in finding that it was done by one of the brake-men engaged in switching the cars, since it appears that this was a common practice. It undoubtedly was a negligent act, and unless the negligence of the company in omitting to enact and promulgate proper rules, co-operated with that of the co-employe, the defendant is not responsible.

"On the second trial, the testimony of Donnelly, the yard-master, was greatly enlarged upon the point upon which the case turned. He supplemented his former testimony in impor-tant particulars, although on both trials the question of rules was the main question litigated. On his last examination he testified that he told his men they were not to interfere with the red flag unless told to take it down by the repairmen. He also testified that about half an hour before the accident he had directed his men to take cars from the cripple track and that after giving the order he went south along the cripple track. After he had given the order and observed the flag lying on the ground, and knowing that the repairmen were at work, he directed one of two repairmen (Grant or Wicks) to put the flag in its place again at the end of the north car. The man took up the flag and instead of putting it in its place, went toward the south end of the train with it, and he (Don-nelly) took no further notice of the matter. The credibility of

this story was for the consideration of the jury.  If true, it exhibits a recklessness on the part of Donnelly, for which there is no excuse.   He permitted his order to back the engine (from the north) on to the cripple track, to remain unrevoked although he knew the flag was down, and that the repairmen were at work under the cars, and also that the man he had directed to replace the flag, had taken it in the opposite direction.

"We think upon the present case the same question of fact is presented as before, viz. : whether the defendant had either directly or through its subordinate officers, so regulated the conduct of its business at this place as to afford reasonable protection to the repairmen against accidents like the one in question.   The employment of the defendant was a dangerous one.   The movement of cars against those under which the repairmen were at work, was likely to result in serious injury. The lock switch was left open during the day, and no person was employed to notify the repairmen of the intended movement of the cars.   It was especially important, therefore, that definite regulations should have been enacted by the company or those who represented it at this point.   It was for the jury to determine whether the rule prevailing here provided both for the putting up of the danger signal and its removal, so as to protect the repairmen as far as reasonably could be done against the hazard of the negligence of co-employes.

"The defendant's counsel rely upon an exception taken to the charge.   On the trial the judge admitted in evidence, against the objection of the defendant, the rules of other railroad companies, and among other rules those enacted for the protection of repairmen.   In his charge the judge proceeded at considerable length to instruct the jury upon the obligation of the defendant to make and promulgate proper rules for the conduct of its business.   He then referred to the fact that he had admitted the rules of other companies to be proved, 'not because it was the duty of this company to adopt the rules of any other company, but to better enable you to judge and determine in looking at the different rules that prevail, what is a reasonable and proper rule.'   After some further remarks on this point the judge proceeded :  'I think rules might have

been suggested, not adopted by any company. You have a right to consider whether some rule which occurs to you, even though no company had adopted it, would have been a better rule and given better protection, and such a one as ought to have been adopted and maintained.' The defendant's counsel excepted to that part of the charge 'in relation to the jury determining what were proper rules, and they might conclude what rules should be.' If the charge is to be construed as leaving it to the jury to determine, irrespective of the evidence, what rules ought to have been adopted for the safety of the repairmen, and to find the one way or the other on the question of the defendant's negligence in conformity with a conclusion so reached, the charge was undoubtedly erroneous. But this is not the fair interpretation of the charge. The plain object of the court was to guard the jury against giving undue weight to the fact that more specific and, as the plaintiff's counsel contended, better rules had been adopted by other companies, than had been adopted by the defendant. This is very apparent from what follows the clause quoted : ' So that some other company has adopted a rule, you can't hold as matter of right that this company should have adopted it. If on examining the rules of other companies and those that prevailed here, you should think that one set of them was not a reasonable protection, and the other was, it would help you very much in getting at what ought to be done. That is the reason why this evidence was admitted.'

" The effect of the charge was that the jury were to weigh the evidence and in view of the rules adopted by different companies, determine whether the defendant had discharged its duty in the premises, and that they were not to find a rule proper or improper because some other company has adopted or rejected it. The court was endeavoring to aid the jury in weighing the evidence which related to the rule under which the defendant's business was conducted, and that adopted on the same subject by other companies. We do not think the jury were misled, and moreover the exception is too broad to raise the question now presented, as it covered all that the court had said as to the right of the jury to pass upon the question of proper rules (much of which was plainly proper), as

well as the part of the charge which related to the right to determine what rules should have been adopted.

" We have examined the other exceptions and there are none which calls for the reversal of the judgment.

" The judgment should be affirmed."

*Edwin Young* for appellant.

*Jesse S. L'Amoreaux* and *Nathaniel C. Moak* for respondent.

ANDREWS, J., reads for affirmance.

All concur, except EARL and GRAY, JJ., who dissent on the ground of error in charge, and PECKHAM, J., not sitting.

Judgment affirmed.