to purchase the whole fifty barrels did not bind the plaintiffs. Nor had the plaintiffs any information as to what course Baumann & Son was pursuing. Not until the expiration of 37 days after the delivery of the order upon the warehouseman to Baumann & Son did it advise the plaintiffs that it was not taking the full amount called for in the order. It might well be that if Hendrickson was acting within the actual or apparent scope of his authority in directing Baumann & Son to take five barrels of the order his conduct would have been binding upon the plaintiffs to effectuate the sale from the plaintiffs of but five barrels. This result, however, could not be attained without some proof upon which the court might find that Hendrickson was plaintiffs' broker.

As the case stands, the plaintiffs tendered fifty barrels of catsup to Baumann & Son. Where manual delivery of goods is inconvenient on account of their bulk, it is unnecessary; placing the goods in the power of the vendee is sufficient. An actual delivery is not required. A symbolic delivery suffices, and delivery of an order on the warehouseman may be enough. Dunham v. Pettee, 8 N. Y. 508. Generally speaking, an acceptance of property of defendants, without any offer to return at any time, deprives the vendees of a right to complain as to quality or quantity. Unless Hendrickson was plaintiffs' agent, the act of Baumann & Son, at least so far as the plaintiffs were concerned, was that of absolute ownership over the full fifty barrels of catsup. The indorsement on the warehouse order to deliver five barrels of this catsup to the bearer cannot be construed into a refusal to accept plaintiffs' offer to sell fifty barrels and an acceptance of an implied offer to sell five barrels, for this reason, if for no other: that it does not appear that the plaintiffs ever had notice of the indorsement on the warehouseman's order. By what right the warehouseman delivered forty-five of the remaining barrels to others than Baumann & Son, if he did so, presents a question which is aside from the issues in this case. Under the circumstances disclosed by the record, it is clear to us that the failure of Baumann & Son to return the order upon the warehouseman amounted to an acceptance of the goods, in the absence of any proof tending to show that Hendrickson was the agent of the plaintiffs when he stated to Baumann & Son to obtain the five barrels desired by means of the warehouse order for fifty.

The judgment should be reversed, and a new trial ordered; costs to abide the event. All concur.

---

JOHNSON v. PRINE LINE, Limited.

(Supreme Court, Appellate Division, Second Department. April 21, 1905.)

MASTER AND SERVANT—NEGLIGENCE OF MASTER—FAILURE TO PROMULGATE RULES.

     A shipowner cannot be deemed negligent in having failed to promulgate a rule requiring two men to be always present during the operation of a winch used in lowering freight into the hold, merely because a servant in the hold was injured during and because of the absence of one of the

two men usually present tending the winch, where there is no evidence that any similar accident had ever occurred, nor that any other employer had made or enforced such a rule, nor that the shipowner had had any reason to anticipate that any one of its employés would have abandoned his work to get a drink, as the absent employé did, nor that there was any reason to anticipate danger to an employé in the temporary absence of one of the men tending the winch.

Appeal from Trial Term.

Action by Peter Johnson against the Prine Line, Limited. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, RICH, and MILLER, JJ.

H. Snowden Marshall, for appellant.

Joseph Rosenzweig, for respondent.

WOODWARD, J. The complaint alleges several grounds of negligence on the part of the defendant, but the case, as finally submitted to the jury, resolved itself into a single question of fact, and that was whether the defendant was negligent in not providing rules and regulations for the operation of a winch under the circumstances under which the accident complained of occurred; the question being raised by defendant's exception to the charge. The facts, which are not seriously in dispute, are as follows: The plaintiff was employed in a gang of eight men as a longshoreman, and was engaged in stowing away a cargo in the Eastern Prince, a steamship operated by the defendant. He was down in the hold of the vessel. The work under way was transshipping from a barge to the hold of the vessel a quantity of flour in bags. The plaintiff, with a helper, was stationed upon a temporary platform erected under one of the hatchways; and it was the duty of these men, when a draught of 10 or 12 bags of flour was lowered to them, to take it from the sling and to place it where it could be reached by others and carried to the point where it was being stowed. On the deck of the vessel was an ordinary winch used in this class of work, and at the time of the accident the draughts were being made up on the barge, and the sling attached to a rope which passed around the drum of the winch, and were raised by steam power to a point where they would swing over the hatchway where the plaintiff was at work. The steam was then turned off, and the draught was lowered by hand; the rope being wound around the drum of the winch and permitted to slip around the same by the man employed for that purpose, who allowed the rope to slip through his hands when the draught was to be lowered. In addition to the man who handled this rope, the defendant employed a man to operate the valve which controlled the steam operating the winch, and, when the draught had been drawn up from the barge and suspended, it was the duty of the latter to turn off the steam. One Jorgensen, who had been placed to operate the rope about the drum of the winch, left his post for the purpose of going to a neighboring saloon for a drink; leaving the winchman to turn on and off the steam, and at the same time to operate the rope to lower the draughts. While

attempting to perform both of these services the winchman in some manner permitted one of the coils of rope to fall off from the end of the drum, and the draught, which hung suspended over the hatchway, fell to the hold below, striking the plaintiff in such manner that he was thrown from the platform where he was working and was seriously injured. It was brought out in the evidence that it was customary to have two men to operate the lowering apparatus in the manner then under way, and that the defendant had promulgated no rules requiring the presence of two men at all times when the draughts were being lowered in the manner described; and the learned justice presiding at the trial charged the jury that if they found that, in the exercise of reasonable care, the defendant should have anticipated this accident, it was its duty to have provided a rule in substance forbidding the operation of the winch in the manner then in use in the absence of two men. The defendant excepted to this charge, and the only question presented upon this appeal is whether this question was properly left for the determination of the jury.

While it is probably true that the necessity for rules is for the jury to determine, when the evidence is sufficient to raise the question (Devoe v. N. Y. C. & H. R. R. Co., 174 N. Y. 1, 10, 66 N. E. 568), we are of opinion that in the case at bar the evidence did not justify the submission of this question. There was not only no evidence that any similar accident had ever occurred, but it was affirmatively shown that the man Johnson, who was attempting to do both men's work, and who had had an experience of 40 years in similar work, had never known of such an accident. There was no evidence that any other employer had ever made or enforced such a rule, although it was shown that winches of the character here under consideration had been in use for 20 years or more. But back of all this, there was no evidence that the defendant had any reason to anticipate that one of its employés would abandon his work to go to a saloon for a drink, or that there was any reason to anticipate danger to one of its employés in the temporary absence of one of the men who was employed to operate the winch. There is no evidence that the plaintiff, occupying a place upon a temporary platform, was necessarily in such position, or that it was the customary method of doing the work, while the plaintiff himself testifies on cross-examination:

"In all my seven years' experience I had never seen a bag drop. That is right. Of course, we wouldn't stand right underneath the draught. We never did. I never did, for my part. A man wouldn't be that foolish to stand underneath things like that coming down over your head, and for that reason I always kept to one side, like. * * * I always kept out from underneath the bags. I knew the bags were coming, because they just come right over the skid, in the middle of the skid—to the stage. We stood one on each side of the place where the bag was. Didn't stand right underneath."

It will thus be seen that the defendant, so far as the evidence goes, had no reason to anticipate danger to the employés; they did not stand under the draughts, but to one side; and the only evidence on which could be predicated any lack of care on the part of the defendant in not promulgating rules to prevent the operation

of the winch by a single individual in the case of the temporary absence of one of the men was the fact that this accident happened. It seems to us that, in order to have a question for the jury, it was necessary to have some evidence that a rule of this kind would be practical in operation, and that before the happening of this accident there was something in the facts and circumstances surrounding the employment which should have suggested to reasonably prudent men that there was danger to employés in the absence of such a rule. The case is devoid of such evidence. There is merely the fact that this accident occurred, and that the defendant had not made a rule for the government of the operation of this winch during a temporary absence of a fellow employé, who in this particular instance was not answering a normal demand of nature, but was engaged in satisfying an appetite for drink; and a rule which would suspend the entire operations of a gang of men engaged in loading a ship while one of their number went out to take a drink would require some fairly well-defined and reasonably anticipated danger to justify it. "It is known of all," say the court in the Devoe Case, supra, "that men are prone to run risks in order to save time and trouble, especially when the risk lasts but a moment, and the precaution necessary to guard against it requires a considerable period of time;" and it was pointed out that in making rules there should be a recognition of these tendencies, to the end that the real object of the rules might be accomplished.

If the evidence had shown that a similar accident had ever occurred where it would have been likely to have attracted the attention of the defendant, if it had been established that the plaintiff was called upon to occupy a place where these draughts hung over him, or if it had appeared that any other employer had ever discovered the necessity or advisability of such a rule as the learned court suggested, there might be some question for the jury to pass upon; but, with the mere fact of this particular accident, which may have been due to the particular circumstances of the moment, and which might not occur again in a lifetime, and the fact that the defendant had made no such rule, before them, it was error to submit the question to the jury. The mere fact that such a rule would have prevented the accident here under consideration is not the test of negligence. The question is, did the defendant have reason to believe, or was it reasonable, in the exercise of reasonable care, to anticipate, that this or a similar accident would occur if it failed to make a rule or regulation governing the operation of this winch during the temporary absence of an employé? There were no facts before the jury from which such an inference could be legitimately drawn, and it is only in the presence of such evidence that there is a question for the jury to determine. Corcoran v. New York, N. H. & H. R. Co., 58 App. Div. 606, 69 N. Y. Supp. 73; Ward v. Manhattan R. Co., 95 App. Div. 437, 441, 88 N. Y. Supp. 758, and authorities there cited; Koszlowski v. American Locomotive Co., 96 App. Div. 40, 44, 89 N. Y. Supp. 55, and authorities there cited.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event. All concur.